CITY OF CINCINNATI, APPELLANT, *v.* BASKIN, APPELLEE.

[Cite as *Cincinnati v. Baskin,* 112 Ohio St.3d 279, 2006-Ohio-6422.]

(No. 2004–1829—Submitted October 26, 2005—Decided December 8, 2006.)

ALICE ROBIE RESNICK, J.

{¶ 1} On May 31, 2003, defendant-appellee, Colt Lee Baskin, was charged with violating Cincinnati Municipal Code 708–37, which prohibits the possession of semiautomatic firearms, including any semiautomatic rifle with a capacity of more than ten rounds.[1] The complaint alleged that Baskin was observed to be in possession of "a semi automatic firearm assault rifle SKS capabele [sic] of a capacity of more than ten rounds. Magazine affixed not detachable."

{¶ 2} Baskin moved to dismiss the charge, claiming that the ordinance is in conflict with the state statutes governing the possession of firearms. The trial

---

1. {¶ a} Cincinnati Municipal Code 708–37 provides:

{¶ b} "(a) No person shall sell, deliver, rent, lease, offer, or display for sale, or transfer ownership of, acquire or possess a semiautomatic firearm.

{¶ c} " * * *

{¶ d} "(h) The term 'semiautomatic' means any firearm designed or specially adapted to fire a single cartridge and automatically chamber a succeeding cartridge and ready to fire, with a single function of the trigger.

{¶ e} "(i) For the purpose of this section, 'semiautomatic firearm' shall have the following meanings:

{¶ f} "(1) Any semiautomatic rifle or carbine that was originally designed with or has a fixed magazine or detachable magazine with a capacity of more than ten rounds."

court granted the motion on October 23, 2003, finding that Cincinnati Municipal Code 708–37 "mak[es] something illegal, which * * * under State law would be permitted."

{¶ 3} In a split decision, the court of appeals affirmed the judgment of the trial court. In so doing, the court of appeals identified R.C. 2923.11(E) as "[t]he Ohio statute upon which the disagreement turns in this case." *Cincinnati v. Baskin,* 158 Ohio App.3d 539, 2004-Ohio-5055, 817 N.E.2d 433, at ¶ 5. R.C. 2923.11(E) defines "automatic firearm," the possession of which is prohibited under R.C. 2923.17(A), to include "any semi-automatic firearm designed or specifically adapted to fire more than thirty-one cartridges without reloading."[2] The court of appeals determined that "R.C. 2923.11 is a general law" because it "addresses conduct of the citizenry, rather than actions of a municipal legislative body." Id. at ¶ 10. Agreeing with Baskin that "Ohio allows its citizens to have a [semiautomatic] firearm that can fire up to 31 rounds," id. at ¶ 6, the court of appeals concluded that "the municipal ordinance and the state statute differ with regard to the lawful number of rounds permitted by one possessing a semiautomatic firearm: the ordinance prohibits what the state permits. Therefore, * * * the municipal ordinance must give way to the state statute." Id. at ¶ 13.

{¶ 4} The dissenting judge stated, "I cannot agree that a definition is a general law. The majority holds that R.C. 2923.11(E) is a general law because it addresses the conduct of the citizenry. But when did defining a term become 'the conduct of the citizenry'? Definitions have nothing to do with conduct." Id. at ¶ 14. The dissenting judge opined, "[E]ven if a definition were a general law, the [municipal and state] provisions do not conflict." Id. at ¶ 20. In the dissent's view, prohibiting the possession of a semiautomatic firearm that holds more than 31 cartridges is not tantamount to allowing the possession of a semiautomatic firearm that holds up to 31 cartridges. Id. at ¶ 19. Thus, according to the dissent, the ordinance does not prohibit what the statute permits. Id. at ¶ 23.

{¶ 5} The cause is now before this court upon the acceptance of a discretionary appeal.

{¶ 6} The issue for our consideration is whether Cincinnati Municipal Code 708–37's prohibition against the possession of a semiautomatic rifle with a

---

2. {¶ a} R.C. 2923.17(A) provides, "No person shall knowingly acquire, have, carry, or use any dangerous ordnance." R.C. 2923.11(K) defines "dangerous ordnance" to mean, among other things, "(1) [a]ny automatic * * * firearm." R.C. 2923.11(E) provides:

{¶ b} " 'Automatic firearm' means any firearm designed or specifically adapted to fire a succession of cartridges with a single function of the trigger. 'Automatic firearm' also means any semi-automatic firearm designed or specially adapted to fire more than thirty-one cartridges without reloading, other than a firearm chambering only .22 caliber short, long, or long-rifle cartridges."

magazine capacity of more than ten rounds is unenforceable as being in conflict with a general law of the state.

{¶ 7} Section 3, Article XVIII of the Ohio Constitution, which is known as the home-rule provision, provides:

{¶ 8} "Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws."

{¶ 9} In *Canton v. State*, 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, at ¶ 9, the court summarized the test for determining whether a municipal ordinance is displaced by a state measure:

{¶ 10} "A state statute takes precedence over a local ordinance when (1) the ordinance is in conflict with the statute, (2) the ordinance is an exercise of the police power, rather than of local self-government, and (3) the statute is a general law."

{¶ 11} There is no dispute in this case that Cincinnati Municipal Code 708–37 is an exercise of the police power, rather than of local self-government, and is therefore susceptible to displacement by conflicting general laws. In addressing the other two prongs of the test, however, both the parties and the court of appeals have complicated matters by making R.C. 2923.11(E) the focal point of their inquiry. As a result, they have embroiled themselves in a pointless theoretical debate as to whether a statutory definition constitutes a general law for purposes of home-rule analysis.

{¶ 12} In determining whether the general-law requirement is met in this case, the court of appeals should have focused on R.C. 2923.17(A), which provides that "[n]o person shall knowingly acquire, have, carry, or use any dangerous ord-nance." It is R.C. 2923.17(A), not R.C. 2923.11(E), that must qualify as a general law in this case. One who has a semiautomatic firearm with the qualities described in R.C. 2923.11(E) is guilty of unlawful possession of dangerous ordnance in violation of R.C. 2923.17(A). See R.C. 2923.17(D). For present purposes, R.C. 2923.17(A) essentially provides, "No person shall knowingly acquire, have, carry, or use any [semi-automatic firearm designed or specially adapted to fire more than thirty-one cartridges without reloading]." Recognition of this fact would have obviated the amorphous controversy over the status of a definition.

{¶ 13} There is no question that R.C. 2923.17(A) is a general law. In *Canton*, supra, the court established a test to determine whether a provision of a state statute is a general law. "To constitute a general law for purposes of home-rule analysis, a statute must (1) be part of a statewide and comprehensive legislative enactment, (2) apply to all parts of the state alike and operate uniformly

throughout the state, (3) set forth police, sanitary, or similar regulations, rather than purport only to grant or limit legislative power of a municipal corporation to set forth police, sanitary, or similar regulations, and (4) prescribe a rule of conduct upon citizens generally." Id., 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, at the syllabus.

{¶ 14} Appellant, city of Cincinnati, concedes that "[l]aws regulating possession of firearms meet the first three requirements." And since we have already determined that only R.C. 2923.17(A) must qualify as a general law, we reject appellant's contention that R.C. 2923.11(E) fails to satisfy the fourth requirement "because this statute merely establishes a definitional standard for semiautomatic firearms." Clearly, R.C. 2923.17(A) prescribes a rule of conduct upon citizens generally, i.e., that no person shall knowingly possess any dangerous ordnance, including any semiautomatic firearm that is designed or modified to accommodate more than 31 cartridges.

{¶ 15} Appellant further argues, however, that even if R.C. 2923.11(E) and 2923.17(A) are construed together, the statute still fails as "a regulation on the conduct of ordinary citizenry." According to appellant, if the General Assembly intended to prevent municipalities from "regulating semiautomatic firearms capable of firing fewer than 31 cartridges, [it] would have overtly incorporated such preemption into the code's language, as it did in enacting the concealed carry legislation." Instead, by virtue of its "silence on preempting the field of this restriction," the General Assembly "implicitly recognizes that some firearms are more dangerous in certain environments" and that municipalities will continue "to enact legislation [in this area] designed to meet the specific needs of their residents." Appellant concludes, therefore, that the statute "is not a general law that preempts the City of Cincinnati from enacting legislation regulating semiautomatic firearms capable of firing fewer than 31 cartridges."

{¶ 16} This argument basically summarizes appellant's position on the issue of conflict, but has no real bearing on whether R.C. 2923.17(A) is a general law. Essentially, appellant cites the absence of a preemption clause to support a construction of the statute that is compatible with the ordinance. The construction urged by appellant is that the statute merely prohibits the possession of semiautomatic firearms with capacities exceeding 31 cartridges; it does not permit or declare a right to the possession of semiautomatic firearms that hold up to 31 cartridges. Under this construction, there is no conflict between the local and state provisions because the statute commits the regulation of lower-capacity firearms to municipal control.

{¶ 17} In its attempt to apply a general-law analysis, however, appellant erroneously assumes that a statute must declare something to be a right in order to meet the rule-of-conduct requirement. But forbidding an act is just as much prescribing a rule of conduct as is permitting an act. Thus, even if appellant is

correct that the statute has no preclusive effect on a municipality's ability to regulate semiautomatic firearms capable of firing 31 or fewer cartridges, R.C. 2923.17(A) is still a general law for purposes of Section 3, Article XVIII of the Ohio Constitution.

{¶ 18} This brings us to the crucial issue, which is whether Cincinnati Municipal Code 708–37, to the extent that it prohibits the possession of any semiautomatic rifle with a magazine capacity of more than ten rounds, is in conflict with R.C. 2923.17(A).

{¶ 19} It has long been established that "[i]n determining whether an ordinance is in 'conflict' with general laws, the test is whether the ordinance permits or licenses that which the statute forbids and prohibits, and vice versa." *Struthers v. Sokol* (1923), 108 Ohio St. 263, 140 N.E. 519, at paragraph two of the syllabus. See, also, *State v. Burnett* (2001), 93 Ohio St.3d 419, 431, 755 N.E.2d 857; *Middleburg Hts. v. Ohio Bd. of Bldg. Stds.* (1992), 65 Ohio St.3d 510, 512, 605 N.E.2d 66. In other words, "[n]o real conflict can exist unless the ordinance declares something to be right which the state law declares to be wrong, or vice versa." *Sokol,* 108 Ohio St. at 268, 140 N.E. 519.

{¶ 20} It is also well established that "in order for such a conflict to arise, the state statute must positively permit what the ordinance prohibits, or vice versa, regardless of the extent of state regulation concerning the same object." *Cincinnati v. Hoffman* (1972), 31 Ohio St.2d 163, 169, 60 O.O.2d 117, 285 N.E.2d 714. See, also, *State ex rel. King v. Summit Cty. Council,* 99 Ohio St.3d 172, 2003-Ohio-3050, 789 N.E.2d 1108, at ¶ 39; *Cleveland v. Raffa* (1968), 13 Ohio St.2d 112, 114, 42 O.O.2d 329, 235 N.E.2d 138.

{¶ 21} In applying this test to the present dispute, the court of appeals necessarily had to interpret the statute to not only prohibit the possession of any semiautomatic firearm that can fire more than 31 rounds without reloading, but to also imply a right to the possession of any semiautomatic firearm that can fire up to 31 rounds without reloading. Otherwise, it could not have found that the ordinance prohibits what the statute permits.

{¶ 22} We acknowledge that in *Am. Fin. Servs. Assn. v. Cleveland,* 112 Ohio St.3d 170, 2006-Ohio-6043, 858 N.E.2d 776, this court recently held that the Cleveland ordinances were in conflict with the state measures because Cleveland had "undertaken to regulate the making of a loan authorized by the General Assembly." Id. at ¶ 48.

{¶ 23} The instant case is distinguishable, however, because Cincinnati has not undertaken to regulate or prohibit any conduct that the state has authorized. The relevant state statutes, i.e., R.C. 2923.11 and 2923.17, prohibit the possession of semiautomatic firearms that are designed or adapted to fire more than 31 cartridges without reloading. They do not, however, permit or authorize the possession of semiautomatic firearms that are capable of firing 31 or fewer

cartridges without reloading. There is nothing in the weapons-control measures in the criminal code that manifests an intent to prevent municipalities from regulating the possession of semiautomatic firearms that hold fewer than 32 rounds. There is no provision in the statute declaring or otherwise suggesting that the limitation upon firing capacity fixed therein is the only limitation controlling the possession of a semiautomatic firearm, that the limitation shall not be diminished or altered by municipal regulation, or that municipalities may not prohibit the possession of lower-capacity firearms than are prohibited by the statute. Nor is it entirely clear that the statute is even concerned with the regulation of semiautomatic firearms as a separate class of dangerous ordnance, other than to ensure that higher-capacity semiautomatic firearms are prohibited along with automatic firearms.

{¶ 24} In the absence of any limiting provision or declaration to the contrary, we conclude that the General Assembly intended to allow municipalities to regulate the possession of lower-capacity semiautomatic firearms in accordance with local conditions, requiring only that under no condition shall municipalities allow the possession of any semiautomatic firearm that is capable of firing more than 31 cartridges without reloading. Thus, the ordinance does not prohibit what the statute permits.

{¶ 25} Accordingly, we hold that Cincinnati Municipal Code 708–37, which prohibits the possession of any semiautomatic rifle with a magazine capacity of more than ten rounds, is not in conflict with R.C. 2923.17(A) for purposes of Section 3, Article XVIII of the Ohio Constitution.

{¶ 26} Based on the foregoing, the judgment of the court of appeals is reversed, and the cause is remanded to the trial court for further proceedings.

Judgment reversed<br>
and cause remanded.

MOYER, C.J., PFEIFER and LANZINGER, JJ., concur.

LUNDBERG STRATTON, J., concurs in the syllabus and the judgment.

O'CONNOR and O'DONNELL, JJ., concur in judgment only.

---

**O'CONNOR, J., concurring in judgment only.**

{¶ 27} Appellant, the city of Cincinnati, has asked this court to determine whether Cincinnati Municipal Code 708–37, which prohibits possession of any semiautomatic rifle with a magazine capacity of more than ten rounds, conflicts with R.C. 2923.17(A) for purposes of Section 3, Article XVIII of the Ohio Constitution, otherwise known as the Home Rule Amendment. I conclude that the ordinance and the statute do not conflict, and therefore I concur in the judgment of the majority.

GENERAL–LAW ANALYSIS

{¶ 28} I agree with the majority that we should focus on R.C. 2923.17(A) when determining whether the ordinance conflicts with state law. I further believe, however, that the reason we must focus on that section is because neither the definitional section, R.C. 2923.11(E), nor the prohibitory section, R.C. 2923.17(A), could stand alone. R.C. 2923.11 defines various terms, including "automatic firearm" and "dangerous ordnance." The statute reads: " 'Automatic firearm' * * * means any semi-automatic firearm designed or specially adapted to fire more than thirty-one cartridges without reloading * * *." R.C. 2923.11(E). It further defines "dangerous ordnance" as "[a]ny automatic or sawed-off firearm * * *." R.C. 2923.11(K)(1). These definitions by themselves are meaningless in the context of a general-law analysis. Similarly, the prohibition in R.C. 2923.17(A), which states that "[n]o person shall knowingly acquire, have, carry, or use any dangerous ordnance" would be void for vagueness on its own. The statute bars knowingly possessing dangerous ordnance, but the statute by itself fails to define what "dangerous ordnance" includes. Only when read in conjunction with R.C. 2923.11 does this statute create an interpretable prohibition. Accordingly, in deciding whether the general-law requirement is met in this case, the court of appeals should have focused on R.C. 2923.11(E) and (K) in conjunction with R.C. 2923.17(A), rather than focusing only on R.C. 2923.11(E).

{¶ 29} As there is no question that R.C. 2923.17(A), in conjunction with the definitions provided in R.C. 2923.11(E) and (K), qualifies as a general law under the test we set forth in *Canton v. State*, 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, I agree that the statutes, read together, qualify as general law.

### HOME RULE: DOES THE ORDINANCE CONFLICT WITH THE STATUTE?

{¶ 30} This brings me to the crucial issue, which is whether Cincinnati Municipal Code 708–37, to the extent that it prohibits the possession of any semiautomatic rifle with a magazine capacity of more than ten rounds, conflicts with R.C. 2923.17(A).

{¶ 31} The immense body of case law regarding conflict analysis dispensed by this court over the past 90 years has proven increasingly complex, yet the basic rule of conflict has not changed: "In determining whether an ordinance is in 'conflict' with general laws, the test is whether the ordinance permits or licenses that which the statute forbids and prohibits, and vice versa." *Struthers v. Sokol* (1923), 108 Ohio St. 263, 140 N.E. 519, paragraph two of the syllabus. See, also, *State v. Burnett* (2001), 93 Ohio St.3d 419, 431, 755 N.E.2d 857. In other words, "[n]o real conflict can exist unless the ordinance declares something to be right which the state law declares to be wrong, or vice versa." *Sokol*, 108 Ohio St. at 268, 140 N.E. 519.

### 1. Conflict by Implication

{¶ 32} Although neither party used the term "conflict by implication" in its brief, both parties discussed whether the ordinance prohibits that which the statute implicitly permits. If this court were to adopt the concept of conflict purely by implication, we would essentially be holding that a statute's prohibiting one thing is the same as permitting everything else. For example, if the state were to pass legislation stating that fireworks could not be used between 2:00 a.m. and 6:00 a.m., that statute would also implicitly grant citizens the right to use fireworks between 6:00 a.m. and 2:00 a.m. Accordingly, any ordinance that purported to prohibit the use of fireworks during different hours would conflict with the statute. Likewise, in this case, Baskin argues that because the state statute prohibits possession only of semiautomatic firearms with a capacity of more than 31 rounds, the legislature also granted the citizens of this state a right to possess any semiautomatic firearm with a capacity of 31 or fewer rounds. Thus, Baskin argues, the Cincinnati ordinance conflicts with the state statute by prohibiting that which the statute implicitly permits.

{¶ 33} Although this court recently discussed the concept of conflict by implication in *Am. Fin. Servs. Assn. v. Cleveland*, 112 Ohio St.3d 170, 2006-Ohio-6043, 858 N.E.2d 776, this case requires a more expansive analysis of the concept. In *Am. Fin.*, the legislature clearly indicated that it intended to occupy the field of loan regulation, so that any ordinance on that topic would conflict with the legislature's intent to provide uniform loan regulation. We did not need to consider whether a conflict could be purely by implication, because statutory language distinctly showed that a conflict existed. No such statutory language showing a conflict exists in this case, and we must therefore determine whether to recognize conflicts that arise purely by implication.

{¶ 34} The Ohio constitutional provision rendering void any municipal ordinance in conflict with state statutes first appeared during the Constitutional Convention of 1912. Vaubel, Municipal Home Rule in Ohio (1978) 679. The original draft stated that the powers of local government were to be "subject to general laws," but that section was altered to prohibit only municipal ordinances that conflicted with state statutes. Id. The original proposal further provided that " 'no such regulations shall * * * be deemed in conflict therewith unless the general assembly, by general law, affecting the welfare of the state as a whole, shall specifically deny all municipalities the right to act thereon.' " [3] Id., quoting 2 Proceedings and Debates of the Constitutional Convention of the State of Ohio (1913) 1313. The provision that voided only ordinances in actual conflict with state statutes was apparently "intended to overturn previous law, which directed

---

3. This is essentially what occurred in *Am. Fin.*, 112 Ohio St.3d 170, 2006-Ohio-6043, 858 N.E.2d 776.

that even in the absence of an express state denial, a stricter municipal regulation was in conflict." (Footnote deleted.) Id. The change in the section's language during the Constitutional Convention shows that the delegates rejected the concept of conflict purely by implication. The delegates believed that as long as the state legislature did not indicate an intent to occupy the field or to prevent a stricter standard, a municipality could freely pass any ordinance stricter than state legislation, as long as the ordinance could coexist with state legislation.

{¶ 35} Other states similarly interpret "conflict" when applying their home-rule laws:

{¶ 36} "A municipality may * * * enact ordinances related to subjects in which the state does not have an overriding interest which requires it to retain exclusive control. For instance, a state does not have an overriding state interest in gun control which requires it to retain exclusive control in order to prevent a home-rule unit from adopting an [sic] conflicting enactment; therefore, a municipality can exercise its police power to prohibit handguns. However, if a local ordinance permits what a statute forbids or prohibits what a statute authorizes, there is a conflict between the statute and ordinance and the ordinance is preempted; if both are prohibitory and the ordinance merely goes further in its prohibition, though not counter to the prohibition in the statute, there is no conflict.

{¶ 37} "Absent a clear manifestation of legislative intent to preempt a field of regulation, a municipality may enact an ordinance which neither conflicts with the state legislation nor is itself unreasonable." 56 American Jurisprudence 2d (2000) 433–434, Municipal Corporations, Section 393.

{¶ 38} Accordingly, "[t]he mere fact that the state, in the exercise of the police power, has made certain regulations does not prohibit a municipality from exacting additional requirements. * * * [A]n ordinance [that] enlarges upon the provisions of a statute by requiring more than the statute requires creates no conflict therewith unless the statute limits the requirement for all cases to its own prescription." 56 American Jurisprudence 2d (1971) 408–409, Municipal Corporations, Section 374. Instead, such an ordinance may stand when " 'there is nothing contradictory between the provisions of the statute and the ordinance because of which they cannot coexist and be effective.' " *Detroit v. Qualls* (1990), 434 Mich. 340, 362–363, 454 N.W.2d 374, quoting 56 American Jurisprudence 2d 409, Municipal Corporations, Section 374. See, also, *Savage v. Prator* (La.2006), 921 So.2d 51, 58; *Wichita v. Hackett* (2003), 275 Kan. 848, 851–852, 69 P.3d 621; *Modern Cigarette, Inc. v. Orange* (2001), 256 Conn. 105, 120, 774 A.2d 969; *Brown v. Yakima* (1991), 116 Wash.2d 556, 559, 807 P.2d 353; *City & Cty. of Denver v. Howard* (Colo.1981), 622 P.2d 568, 570; *Illinois Liquor Control Comm. v. Joliet* (1975), 26 Ill.App.3d 27, 33, 324 N.E.2d 453; *Charleston v. Jenkins* (1963), 243 S.C. 205, 211–212, 133 S.E.2d 242; *Taggart v. Latah Cty.* (1956), 78 Idaho 99, 104, 298 P.2d 979.

{¶ 39} This interpretation of "conflict" is also exemplified in other case law and secondary sources: "In matters of mixed local and state concern, a home rule municipal ordinance may coexist with a state statute as long as there is no conflict between the ordinance and the statute * * *." 62 Corpus Juris Secundum (1999) 260, Municipal Corporations, Section 143. See *Leavenworth Club Owners Assn. v. Atchison* (1971), 208 Kan. 318, 320–321, 492 P.2d 183; *Des Moines v. Reiter* (1960), 251 Iowa 1206, 1209, 102 N.W.2d 363; *Lake Charles v. Theall* (1954), 227 La. 461, 469, 79 So.2d 739; *Kansas City v. Troutner* (Mo.App. 1976), 544 S.W.2d 295, 298. An ordinance creating a stricter prohibition, therefore, would appear to be valid using this interpretation of "conflict," as long as the state legislature has not expressly or implicitly prohibited alteration of the proscription by a valid preemption.

{¶ 40} Some states interpret "conflict" more broadly by recognizing what they often call "implied preemption" of a field. For example, California has determined that preemption by implication arises in three situations. First, preemption may be implied when the particular area involved has been fully and completely covered by general law, indicating the intent that the area is one of exclusive state concern. *Morehart v. Cty. of Santa Barbara* (Cal.1994), 7 Cal.4th 725, 751, 29 Cal.Rptr.2d 804, 872 P.2d 143. Second, preemption is implied when the area of law involved is partially covered by general law with terms indicating that " ' "a paramount state concern will not tolerate further or additional local action." ' " Id., quoting *State ex rel. Deukmejian v. Mendocino Cty.* (1986), 36 Cal.3d 476, 485, 204 Cal.Rptr. 897, 683 P.2d 1150, quoting *In re Hubbard* (1964) 62 Cal.2d 119, 128, 41 Cal.Rptr. 393, 396 P.2d 809. Finally, preemption may be implied when the area of law is partially covered by general law and " ' "the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the municipality." ' " Id.

{¶ 41} Courts in Michigan consider whether a state statute preempts an ordinance by considering four factors: (1) whether state law expressly preempts the area of law, (2) whether preemption should be implied based upon legislative history, (3) whether preemption may be implied based on the pervasiveness of a state regulatory scheme, and (4) whether the nature of the regulated subject matter demands exclusive state regulation to achieve the uniformity necessary to serve the state's purpose or interest. *State v. Llewellyn* (1977), 401 Mich. 314, 323–324, 257 N.W.2d 902.

{¶ 42} Washington courts recognize preemption by implication and consider on a case-by-case basis whether the state intended preemption or concurrent jurisdiction over a field. *Lenci v. Seattle* (1964), 63 Wash.2d 664, 669–670, 388 P.2d 926.

{¶ 43} It is true that one might argue that our prior cases, including *Schneiderman v. Sesanstein* (1929), 121 Ohio St. 80, 167 N.E. 158; *Neil House Hotel Co. v. Columbus* (1944), 144 Ohio St. 248, 29 O.O. 403, 58 N.E.2d 665; and *Lorain v. Tomasic* (1979), 59 Ohio St.2d 1, 13 O.O.3d 1, 391 N.E.2d 726, recognized conflict purely by implication. Closer inspection of those cases, however, reveals that they involved statutory language requiring application of the implied conflict and preemption test laid out above. In *Schneiderman*, state law forbade municipalities to alter state speed-limit legislation, rendering any municipal ordinance purporting to do so in conflict with the intent of the legislature. Id. at 86–87, 167 N.E. 158. The court in *Neil House* relied on statutory language allowing a liquor-premises licensee to sell alcohol until 2:30 a.m., which left no question that a municipality could not ban such sales by a licensee prior to that hour. Id. at 251–252, 29 O.O. 403, 58 N.E.2d 665. Finally, in *Tomasic*, the Ohio Constitution granted the state, and not municipalities, the power to regulate lotteries. Id. at 3, 13 O.O.3d 1, 391 N.E.2d 726. Further, we have applied this general rule in additional cases both in cases where conflict by implication applied [4] and at least one in which it did not.[5]

{¶ 44} After considering the law from various states, as well as our own precedent, I would adopt the following test in regard to an alleged conflict between two prohibitory enactments. A court should first consider the facts and circumstances surrounding the legislation to determine whether the legislature intended to preempt the field. If preemption is either express or implied, the court should next determine whether the legislature validly exercised its legislative authority by preempting the field.[6] If the area is validly preempted, any alteration by a municipality conflicts with the state statute. If, on the other

---

4. *Cleveland Elec. Illum. Co. v. Painesville* (1968), 15 Ohio St.2d 125, 44 O.O.2d 121, 239 N.E.2d 75 (statute exempted certain intercity high-voltage power lines from municipal control); *In re Decertification of Eastlake* (1981), 66 Ohio St.2d 363, 20 O.O.3d 327, 422 N.E.2d 598 (statute allowed use of Romex wiring in industrialized units and authorized placement of such units anywhere in state); *Clermont Environmental Reclamation Co. v. Wiederhold* (1982), 2 Ohio St.3d 44, 2 OBR 587, 442 N.E.2d 1278 (statute prohibited municipality from regulating hazardous-waste-disposal facilities); *Rispo Realty & Dev. Co. v. Parma* (1990), 55 Ohio St.3d 101, 564 N.E.2d 425 (statute set certain procedural requirements for zoning changes); *Ohio Assn. of Private Detective Agencies, Inc. v. N. Olmsted* (1992), 65 Ohio St.3d 242, 602 N.E.2d 1147 (statute prohibited municipality from charging fees for registration or licensure of private investigators and security personnel).

5. *Middleburg Hts. v. Ohio Bd. of Bldg. Stds.* (1992), 65 Ohio St.3d 510, 605 N.E.2d 66 (allowing more stringent local building requirements, based upon language indicating that state rules were merely minimum requirements).

6. For an example of possibly invalid preemption language by a state, see *Denver v. Colorado* (Nov. 5, 2004), 2d Dist. No. 03 CV 3809, www.courts.state.co.us/exec/media/cases/03cv3809order.pdf, affirmed by operation of law in *Colorado v. Denver* (Colo.2006), 139 P.3d 635.

hand, the legislature has not validly preempted an area, a municipal ordinance does not conflict with a state statute if it merely enlarges upon the state statute, i.e., creates a stricter prohibition than the state statute.[7]

{¶ 45} Despite the fact that this court has never specifically adopted a preemption test in the area of conflict, I find the construct emphatically helpful in determining whether an ordinance conflicts with a state statute. The factors enumerated by California and Michigan, although not exclusive, are extremely helpful in this area. For example, preemption by implication may exist based upon language employed by the legislature, the extent of regulation in a field, or the need for uniformity within the field in order to protect the rights of the state's citizens.

## 2. Application to *Baskin*

{¶ 46} In this case, the prohibition enacted by the city merely enlarges upon the prohibition created by the legislature. The two enactments can easily coexist,

---

7. {¶ a} This test clearly encompasses a further relevant doctrine, which states that "[s]tatutes which define crimes confer no privileges either expressly or by implication." Vaubel, Municipal Home Rule in Ohio (1978) 719. "[I]t does not follow from the General Assembly's mere failure to define an act as a crime that it thereby expressly authorizes a person to commit the act." *Wishing Well Club, Inc. v. Akron* (C.P.1951), 66 Ohio Law Abs. 406, 412, 112 N.E.2d 41. See, also, *Benjamin v. Columbus* (1958), 167 Ohio St. 103, 146 N.E.2d 854 (finding that an ordinance that goes further than a statute by imposing penalties for a related act not penalized by the statute does not conflict with that statute). "A statute defining a crime is only a prohibition; it permits nothing. Consequently, a broader definition of a crime as provided by an ordinance does not forbid what a statute permits, and therefore no conflict exists. If the courts had reached any other conclusion, the effect would have been highly destructive of municipal independence in the exercise of local police power over the definition of crimes. At the same time, the courts would have been thrust into an interpretative entanglement requiring them to resolve questions concerning how wide a range of acts could be said to be impliedly permitted by statutory prohibitions." Vaubel at 720.

{¶ b} For example, adoption of the concept of conflict purely by implication would deprive municipalities of the ability to ban conduct identical to that in a state statute because the ordinance could not legitimately include a sentence. The state specifically accords each crime a specific range of punishment, and, purely by implication, the municipality could not, therefore, impose anything beyond the state-allotted punishment. Our case law contradicts that idea. See *Struthers v. Sokol* (1923), 108 Ohio St. 263, 269, 140 N.E. 519 ("the punishment of an act defined as a crime under a state law does not preclude further punishment as a misdemeanor under a municipal ordinance"). This court has struck down additional municipal punishment only when the municipality attempts to add a punishment to a state crime. *State v. Burnett* (2001), 93 Ohio St.3d 419, 431–432, 755 N.E.2d 857. Even in that case, this court reiterated that "a municipal ordinance may proscribe the same conduct as a state criminal statute and impose a penalty greater than the state criminal code imposes." Id. at 431, 755 N.E.2d 857.

{¶ c} Another example of the problems with application of conflict by implication can be found in *Pentco, Inc. v. Moody* (S.D.Ohio 1978), 474 F.Supp. 1001, 1007–1008. In that case, private massage parlor owners argued that a state law banning public nudity implicitly allowed private nudity and that a local ordinance banning nudity in the private massage parlors conflicted with state law. The federal court rejected that analysis.

because if a person is in compliance with the city's ordinance, he is also in compliance with the statute (i.e., if a person does not possess a semiautomatic firearm with a magazine capacity more than ten rounds, then he does not possess a semiautomatic firearm with the capacity of more than 31 rounds). The two prohibitory enactments do not on their face conflict, and to infer that the legislature intended to grant citizens the right to possess a semiautomatic firearm capable of firing up to 31 rounds without reloading based merely on the language of the statute itself misreads the statute.

{¶ 47} In an otherwise nonconflicting circumstance, a municipal ordinance may still conflict with state statutes, however, if the state has expressly indicated its intent to preempt, such as occurred in *Am. Fin.,* or has by implication preempted the field. Unlike the majority of states,[8] Ohio has not adopted statutory language indicating total preemption in regard to firearms, and no language within any of the state statutes regulating firearms indicates that the state intended to preempt the entire field of firearms regulation. The only preemption language relevant to the field of firearms regulation was passed by the legislature in conjunction with the concealed-firearm laws, but that language plainly preempts only an "ordinance or resolution that attempts to restrict the places where a person possessing a valid license to carry a concealed handgun may carry a handgun concealed." Section 9, H.B. No. 12, Baldwin's Ohio Legislative Service Annotated (Vol.1, 2004), L–60–61. But that law relates to where one may carry a

---

8. Thirty-eight states currently have statutes that expressly preempt the field of firearms, although most statutes allow political subdivisions to regulate such matters as place of discharge and possession inside public buildings. See Alaska Stat. 29.35.145; Ariz.Rev.Stat. 13–3108; Ark.Code Ann. 14–16–504; 9 Del.Code 330(c); Fla.Stat. 790.33; Ga.Code Ann. 16–11–173(b)(1); Ind.Code Ann. 35–47–11–2; Iowa Code 724.28; Kan.Stat.Ann. 12–16,124; Ky.Rev.Stat. 65.870; La.Rev.Stat. Ann. 40:1796; 25 Me.Rev.Stat.Ann. 2011; Md.Code Ann.Crim.Law 4–209; Mich.Comp.Laws 123.1102; Minn.Stat. 471.633; Miss.Code Ann. 45–9–51; Mo.Rev.Stat. 21.750; Mont.Code Ann. 45–8–351; Nev.Rev.Stat.Ann. 268.418; N.H.Rev.Stat.Ann. 159:26; Section 6, Article II, N.M. Constitution; N.C.Gen.Stat. 14–409.40; N.D.Cent.Code 62.1–01–03; Okla.Stat. 1289.24; Or.Rev.Stat. 166.170; 18 Pa.Cons.Stat. 6120; R.I.Gen.Laws 11–47–58; S.C.Code Ann. 23–31–510; S.D. Codified Laws 7–18A–36, 8–5–13, and 9–19–20; Tenn.Code Ann. 39–17–1314; Tex.Local Govt.Code Ann. 229.001; Utah Code Ann. 76–10–500; 24 Vt.Stat.Ann. 2295; Va.Code Ann. 15.2–915; Wash.Rev. Code Ann. 9.41.290; W.Va.Code 8–12–5a; Wis.Stat. 66.0409(2); and Wyo.Stat.Ann. 6–8–401. Three states, Alabama, Colorado, and Idaho, have partial-preemption statutes. See Ala.Code 11–45–1.1 (preempting the field of possession and ownership of handguns only); Colo.Rev.Stat. 18–12–105.6(b) (preempting the field of transport of weapons in a private vehicle for a lawful purpose); Idaho Code 31–872 (preempting fields of ownership, possession, and transport of firearms). Illinois and New Jersey expressly permit local legislation on firearms, see 430 Ill.Comp.Stat. 65/13.1 and N.J.Stat. 40:48–1, while Nebraska preempts the field of handgun transfer but grandfathers in any existing municipal regulation. See Neb.Rev.Stat. 69–2401 and 69–2425. Of the remaining six states, Ohio has the least restrictive regulation over firearm possession, transfer, and use. See Cal.Penal Code 12000 et seq.; Conn.Gen.Stat. 29–27 et seq. and 53a–216 et seq.; Haw.Rev.Stat. 134–1 et seq.; 140 Mass.Gen.Laws 121 et seq. and 269 Mass.Gen.Laws 10 et seq.; N.Y.Penal Law 265.00 et seq. and 400.00 et seq. For Ohio statutes, see fns. 11 through 18.

concealed handgun, which in no way relates to whether one may possess a semiautomatic rifle, so it does not preempt the law in question here.

{¶ 48} The legislative history behind the state firearms regulations likewise does not indicate any intent to preempt either the field of firearms regulation or the more limited area of possession of semiautomatic firearms. A brief look at the history of Ohio firearms regulations, and in particular semiautomatic-firearms regulations, might be helpful here. Brigadier General John T. Thompson developed the first handheld, military automatic machine gun, called the submachine gun or "Tommy gun," around 1920. Cramer, For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms (1994) 184. It was initially intended for military use in World War I, but it was not ready for production until the war had ended. To appeal to the nonmilitary customer, Auto–Ordnance, a company that sold the weapon, was forced to alter its marketing strategy for the submachine gun and enthusiastically pronounced " 'that the submachine gun was, in fact, good for anything. Especially anything hard to hit, or that needed to be killed in quantity, or thoroughly intimidated.' " Id. at 184, quoting Helmer, The Gun That Made the Twenties Roar (1969) 75. Auto–Ordnance's claims " 'could have been boiled down to a single slogan: Anything a gun can do, the Thompson can do better.' " Id.

{¶ 49} Although Auto–Ordnance originally marketed the Tommy gun to police departments, the gun soon became a "glamorous weapon for gang warfare" in major cities.[9] Id. at 184–185. The submachine gun garnered much attention for its role in the 1929 St. Valentine's Day Massacre, in which gangsters posing as policemen riddled the bodies of seven rival gangsters with fire from submachine guns. Henderson, Gun Control (2000) 15. Congress seized upon gun control as a national issue following an assassination attempt on newly elected President Franklin D. Roosevelt in 1933. Id. And likewise, in 1933, Ohio passed its first statute prohibiting a person from possessing, transporting, or using a machine gun, light machine gun, or submachine gun, unless the person first obtained a permit and paid a $5,000 bond. G.C. 12819–3 and 12819–4, H.B. No. 166, 115 Ohio Laws 189–190.

{¶ 50} In 1961, the legislature broadened its definition of "machine gun" to include semiautomatic firearms capable of firing more than 18 rounds without reloading. The law exempted .22- or smaller-caliber weapons from the definition. Former R.C. 2923.03, Am.S.B. No. 351, 129 Ohio Laws 420. In 1972, the

---

9. Infamous outlaws, such as Pretty Boy Floyd and Ma Barker, helped to create notoriety for the Tommy gun. Utter, Encyclopedia of Gun Control and Gun Rights (2000) 300. Also known as the "Chicago Piano," the submachine gun was "an uncomplicated weapon, weighed just eight and one-half pounds, * * * could fire a withering hail of bullets, approaching 1,000 rounds per minute, [and] was conveniently available by mail order." Id.

legislature completely overhauled the criminal code in Ohio in an effort to "provide a compact yet complete substantive criminal code, easier to understand and apply, meeting modern needs, and providing the necessary foundation for effective crime prevention, law enforcement, and treatment of offenders." Legislative Service Commission Bill Analysis of 1972 Am.Sub.H.B. No. 511 (law was effective in 1974). Although the legislature modified the previous statutes in order to ban possession, use, or transport of certain semiautomatic firearms it classified as "dangerous ordnance," with only limited exceptions, the new code merely consolidated the firearms regulations without alteration. By 1986, the legislature had twice altered the definition of "dangerous ordnance" to prohibit the possession of a growing class of semiautomatic firearms, including those with a capacity of 32 rounds or more.

{¶ 51} In the 70 plus years since Ohio enacted its first limit on possession of automatic weapons, the state has made only slight changes to the definition that determines what type of weapons are included in this regulation. The only change relevant to this case is the round capacity of the semiautomatic firearm.[10] Throughout Ohio's history of semiautomatic-firearms regulation, the legislature has never indicated that its prohibition on certain semiautomatic firearms could not be made more stringent by municipalities. On the contrary, a memorandum by the Legislative Service Commission in regard to the specific question of whether the 1972 revamp of the criminal code would preempt local firearm legislation specifically states that the legislature intended no such preemption: "The gun control legislation portion of Am.Sub.H.B. No. 511 of the 109th General Assembly, sections 2923.11 to 2923.24, does not pre-empt this field from municipal authorities." Memorandum from Hubert C. Dutro to Senator Gillmor (Mar. 21, 1973). This court, therefore, should not infer preemption of either the field of firearms regulation or the limited area of semiautomatic-firearms regulation based upon the legislative history of semiautomatic-firearms regulation in the state of Ohio.

{¶ 52} Further, this court cannot infer preemption based upon some comprehensive regulatory enactment in the field. Ohio legislation currently touches on only a handful of areas in regard to firearms: Prohibition on ownership of certain

---

10. In 1978, the state increased the limit from 18 to 21 rounds. Former R.C. 2923.11, 137 Ohio Laws, Part II, 3307. The increase was added to legislation prohibiting possession of silencers and mufflers by motion during committee. Materials in the bill file on record with the Ohio Historical Society indicate that the change was entered to accommodate National Trophy Match standards, which required use of a 20–round magazine. See 1978 Am.H.B. No. 728, bill file, State Archives, Ohio Historical Society. The legislature again increased the limit to 31 rounds in 1986 by adding the change to legislation prohibiting possession of a firearm on or in any premises with a liquor license. 141 Ohio Laws, Part I, 1204. No explanation exists in the legislative history for this alteration.

items,[11] prohibition on possession of firearms by certain classes of persons,[12] limitations on the discharge and transport of firearms,[13] limits on places where a firearm may be discharged or possessed,[14] sentencing rules and specifications applied when a firearm is used or possessed during commission of a crime,[15] limitations on interstate sales,[16] concealed-firearm provisions,[17] and various laws

11. R.C. 2923.17 prohibits knowingly acquiring, having, carrying, or using any dangerous ordinance except under specified conditions. "Dangerous ordnance" is defined to include automatic firearms, sawed-off firearms, zip guns, and semiautomatic firearms "designed or specially adapted to fire more than thirty-one cartridges without reloading, other than a firearm chambering only .22 caliber short, long, or long-rifle cartridges." R.C. 2923.11(K) and (E).

12. R.C. 2923.13 prohibits those under disability, for example, felons and fugitives from justice, from possessing any firearm. R.C. 2923.131 extends that prohibition to those under detention at a detention facility, and R.C. 2923.21 generally forbids sales of firearms to those under 18 and sales of handguns to those under 21. Persons under the influence of alcohol or drugs are also prohibited from carrying or using any firearm. R.C. 2923.15.

13. R.C. 1547.69 imposes limits on the possession, discharge, and transportation of firearms on boats, while R.C. 2923.16 imposes similar limits for motor vehicles. R.C. 4519.40 limits transportation of firearms on snowmobiles, off-highway motorcycles, and all-purpose vehicles.

14. Ohio law places limits on possession of firearms in detention and mental-health facilities (R.C. 2921.36), liquor-permit premises (R.C. 2923.121), school safety zones (R.C. 2923.122), and court-houses (R.C. 2923.123) and on the discharge of firearms at permanent habitations (R.C. 2923.161), in state parks (R.C. 1541.19), on airport operation grounds or at airplanes (R.C. 2909.08), on cemeteries, public roads, or highways, and "on a lawn, park, pleasure ground, orchard, or other ground appurtenant to a schoolhouse, church, or inhabited dwelling, the property of another, or a charitable institution" (R.C. 2923.162). The law also prohibits election observers from carrying a firearm. R.C. 3505.21.

15. See R.C. 2941.141 (firearm specification), 2941.144 (specification of use of automatic firearm or firearm with silencer or muffler), 2941.145 (specification that offender displayed, brandished, or indicated possession of a firearm), 2941.146 (specification that offender discharged a firearm from a motor vehicle), 2941.1412 (specification that offender discharged a firearm at a police officer or corrections officer), and 2929.14 (general sentencing statute).

16. R.C. 2923.22 permits any Ohio resident not otherwise prohibited by law from possessing a firearm to purchase a rifle or shotgun or ammunition in Indiana, Kentucky, Michigan, Pennsylvania, or West Virginia, and allows residents of those states to purchase a rifle or shotgun in Ohio if they may, under Ohio law, federal law, and the law of their domicile, possess that firearm. Beyond those allowances, Ohio law prohibits the reckless transfer of a firearm to one who may not possess it under Ohio law (R.C. 2923.20) and renders all sales and purchases subject to the federal Gun Control Act of 1968 (R.C. 2923.22(C)). The only specific requirement placed upon federally licensed firearm dealers by Ohio law is that they must offer a locking device to any purchaser of a firearm at the time of sale. R.C. 2923.25.

17. R.C. 2923.12 generally prohibits a person from carrying or having a concealed handgun unless the person has obtained the proper permit. The license to carry a concealed handgun is governed by R.C. 109.69, 109.731, 311.41, 2923.124 through 2923.1213, and 5122.311, and various other statutes concern allowances for law enforcement and certain other professions to carry concealed weapons. See, e.g., R.C. 4749.10 (certain employees of licensed private investigators and security services),

related to things such as immunity for firearm manufacturers.[18]

{¶ 53} Although this may appear to be a broad array of firearms regulation, in comparison to other states, Ohio has barely touched upon the subject of firearm possession, use, transfer, and ownership.[19] For example, although some municipalities have ordinances requiring that firearms dealers obtain and pay a fee for a local license,[20] no state statute requires a firearms dealer to be registered or licensed with the state. Instead, federal law governing firearms dealers and transactions ensures that dealers are properly investigated and licensed in municipalities that opt not to pass a law requiring local licensure. See Section 922(a), Title 18, U.S.Code. Ohio also does not have a statute that requires a person to obtain a permit or license before obtaining a gun, and has no statute requiring a background check prior to the purchase or transfer of a firearm. Again, local law enforcement conducts background checks on firearm purchasers only because federal law mandates such a check, Section 922(t), Title 18, U.S.Code, and some municipalities have passed ordinances requiring a license or permit to transfer or own a firearm.[21] Municipalities have been left to fill in the

---

R.C. 5502.14(C) (Department of Public Safety food-stamp undercover enforcement agents), and R.C. 5743.45 (investigative employees of the Department of Taxation).

18. Ohio has a handful of other statutes concerning firearms. For example, under certain circumstances, R.C. 2305.401 grants immunity to members of the firearm industry from civil liability and injunctive relief; R.C. 2923.201 prohibits defacing of identification marks on firearms; R.C. 2923.23 grants immunity from prosecution to certain persons who voluntarily relinquish illegally possessed firearms or dangerous ordnance to law enforcement; and R.C. 5502.63 requires the Division of Criminal Justice in the Department of Public Safety to prepare a poster and brochure on safe firearms practices.

19. In comparison to the other four states which have no express firearm preemption statute, Ohio law is rather meager on firearms regulation. The California Penal Code, for example, contains six separate chapters on firearm and firearm-related regulation, including a chapter with four articles dedicated entirely to machine guns, an article with 21 statutes on licenses to sell firearms, and a chapter devoted solely to ammunition. See Cal.Penal Code 12000 et seq. Connecticut has over 30 statutes dedicated to regulations concerning the transfer of firearms, Conn.Gen.Stat. 29–28 et seq., as well as the general criminal regulations concerning possession and discharge of firearms. Conn.Gen.Stat. 53a–216 et seq. Hawaii and New York law require a permit to acquire a firearm, registration of a firearm, and a license to sell firearms. Haw.Rev.Stat. 134–2, 134–3, and 134–31 et seq.; N.Y.Penal Law 265.00 et seq. and 400.00 et seq. In Massachusetts, one must have a license to possess a firearm, 140 Mass.Gen.Laws 129(c), and the state carefully regulates firearms transfers and possession, 140 Mass.Gen.Laws 121 et seq.

20. Of the six largest Ohio municipalities, Akron (Akron Municipal Code 137.23 and 137.24), Cincinnati (Cincinnati Municipal Code 708–9), Columbus (Columbus City Code 545.02), and Toledo (Toledo Municipal Code 549.12) require a firearms dealer to obtain a local license.

21. Akron requires that a dealer maintain certain records of sale filled out by a purchaser and given to the local police. Akron Municipal Code 137.25. Cincinnati requires an individual to file an application for any firearm transfer, including a statement as to the intended use of the firearm,

gaps left by Ohio law regarding possession, transfer, and use of firearms to such a degree that I cannot say that the legislature intended to occupy the field of firearms regulation.

{¶ 54} The strongest argument that Baskin makes to support his assertion that the state statute implicitly preempts the municipal ordinance is that allowing municipalities to bar specific weapons within the municipalities could create a patchwork of regulations that would leave the average citizen wondering whether he could legally possess his weapon when he travels around the state. As noted in oral argument before this court, a person could legally possess a weapon in Municipality A and be permitted to have that weapon in Municipality B, but could not travel directly between the two points with the firearm because Municipality C banned possession.

{¶ 55} This issue, however, is in part addressed by federal law: "Notwithstanding any other provision of any law or any rule or regulation of a State or any political subdivision thereof, any person who is not otherwise prohibited by [federal law] from transporting, shipping, or receiving a firearm shall be entitled to transport a firearm for any lawful purpose from any place where he may lawfully possess and carry such firearm to any other place where he may lawfully possess and carry such firearm * * *." Section 926A, Title 18, U.S.Code. The statute further requires that the firearm be transported unloaded and that neither the firearm nor its ammunition be readily accessible from the passenger compartment. If the vehicle does not have a compartment separate from the passenger's compartment, the firearm or ammunition must be contained in a locked container other than the glove compartment or console. Id. As this statute makes it legal to transport a firearm through a place where possession alone would otherwise be illegal, and that federal statute expressly preempts anything in direct conflict with it, Section 927, Title 18 U.S.Code, Baskin's argument is moot.

{¶ 56} A person should be familiar with the firearms laws governing the locality in which he principally keeps his firearms. He should also be familiar with the local and state firearms regulations for any area in which he intends to use that weapon. In addition, he has the right under federal law to transport

---

requires verification of the applicant's identity by any individual personally known by the transferor, and imposes a 15–day waiting period from the time the application for transfer is received by the police before the applicant may receive the firearm. Cincinnati Municipal Code 708–13, 708–15, and 708–33. Columbus requires each individual to obtain a license for a valid weapon transaction and imposes a seven-day waiting period between application for that license and grant of the license. Columbus City Code 545.06. Dayton requires anyone who possesses a firearm to have a valid owner's identification card in most circumstances. Dayton Code of Ordinances 138.12. Toledo requires a valid identification card for anyone who wishes to obtain a handgun. Toledo Municipal Code 549.11.

that firearm in a certain manner between those two places. Thus, allowing municipalities to pass more restrictive firearms regulations than the state does not, as some may fear, require Ohio residents to research a patchwork of regulations to avoid violating the law.[22] Instead, it only requires that a person know the laws of the jurisdiction where he keeps his gun and the laws where he would like to use his gun.

{¶ 57} The only remaining issue is whether some statewide interest or concern should compel uniformity in the type of weapons that may lawfully be possessed throughout the state. The Ohio Constitution grants Ohio citizens the "right to bear arms for their defense and security." Section 4, Article I, Ohio Constitution. The right, however, is not absolute and is subject to reasonable regulation. *Arnold v. Cleveland* (1993), 67 Ohio St.3d 35, 616 N.E.2d 163, paragraph two of the syllabus. In fact, this court has previously upheld a city's firearms regulation that prohibited possession of firearms that were not prohibited by state law. Id. *Arnold* clearly explains the rationale behind allowing more stringent local firearms regulation as long as the regulation is not " 'arbitrary, discriminatory, capricious or unreasonable and [bears] a real and substantial relation to the object sought to be obtained, namely the health, safety, morals or general welfare of the public.' " Id. at 46, 616 N.E.2d 163, quoting *Cincinnati v. Correll* (1943), 141 Ohio St. 535, 539, 26 O.O. 116, 49 N.E.2d 412. I see no need to reiterate here the rationale expressed in Arnold for upholding Cleveland's regulation banning possession of any semiautomatic rifle that accepts a magazine with a capacity of 20 or more rounds, but it is equally applicable in this case.

{¶ 58} As noted above, Ohio is one of six states that lack a statute preempting regulation in the area of firearms regulations. The legislature has never made clear that it intends to preempt local ordinances concerning firearms, and as long as the local regulations are reasonable and are not in direct conflict with existing Ohio law, this court should not infer preemption. If the legislature intends to preempt any other area of firearms regulation beyond the concealed-firearm provision, it needs to do so explicitly. As the legislature has neither expressly nor implicitly preempted the area of firearms regulation and the local ordinance and state statute may coexist, I find that there is no conflict between Cincinnati Municipal Code 708–37 and Ohio state law.[23]

---

22. A review of many of the largest cities in Ohio reveals that five of them prohibit possession of firearms that are not prohibited by state law: Columbus, Cleveland, Cincinnati, Toledo, and Dayton.

23. This court is aware of the current proposed legislation that would purport to preempt all local firearms ordinances. Any action by the General Assembly would be prospective, and that proposed legislation, therefore, has no influence on this case.

CONCLUSION

{¶ 59} I find that the General Assembly has never explicitly or implicitly preempted the field of gun regulation or the limited area of the class of firearms that may be possessed in Ohio. As the legislature and the nature of the legislation in no way indicate an intent to limit the power of municipalities to pass more restrictive firearms ordinances, I find that Cincinnati Municipal Code 708–37 does not conflict either expressly or by implication with Ohio law, as both prohibitory enactments can coexist and the ordinance in no way prohibits what Ohio law specifically permits. Accordingly, I concur in the reversal of the judgment of the court of appeals.

LUNDBERG STRATTON, J., concurs in the foregoing opinion.

---

**O'DONNELL, J., concurring in judgment only.**

{¶ 60} In my view of the home-rule issue presented to the court in this case, the beginning point in the analysis is to consider Section 3, Article XVIII of the Ohio Constitution, which authorizes municipalities to "exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws."

{¶ 61} Because the Constitution is immutable, pronouncements by the General Assembly regarding preemption or statewide concern, while instructive in considering legislative intent, are powerless to affect the language of the Constitution that empowers municipalities to enact legislation, provided such legislation is not in conflict with a general law.

{¶ 62} The initial step in a home-rule analysis is to determine whether the matter involves local self-government or local police, sanitary, or other similar regulation. *Canton v. State,* 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, syllabus. The consensus in the record before us is that the state legislation and local ordinance are police regulations that differ as to the definition of the term "semiautomatic" weapon. The ordinance, therefore, does involve a police regulation.

{¶ 63} Both the state of Ohio and the city of Cincinnati are authorized to legislate against possession of semiautomatic weapons. The majority here holds that R.C. 2923.17(A) is a general law pursuant to the test we announced in *Canton,* 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, syllabus. There, we established a four-part test for determining whether an enactment of the General Assembly is a general law for home-rule analysis: "a statute must (1) be part of a statewide and comprehensive legislative enactment, (2) apply to all parts of the state alike and operate uniformly throughout the state, (3) set forth police,

sanitary, or similar regulations, rather than purport only to grant or limit legislative power of a municipal corporation to set forth police, sanitary, or similar regulations, and (4) prescribe a rule of conduct upon citizens generally." Id.

{¶ 64} I agree with the majority that R.C. 2923.17(A), which provides, "No person shall knowingly acquire, have, carry, or use any dangerous ordnance," is a general law pursuant to *Canton*. That statute is a statewide police enactment, applies to all parts of the state, and prescribes a rule of conduct upon the citizens of Ohio. *Canton*, 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, syllabus. And in my view, Cincinnati Municipal Code 708–37(a) is very similar. That ordinance provides, "No person shall sell, deliver, rent, lease, offer, or display for sale, or transfer ownership of, acquire or possess a semiautomatic firearm." Therefore, the statute and the ordinance regulate the same conduct: the acquisition and possession of a semiautomatic firearm.

{¶ 65} The difference between these regulations results from the definition contained in R.C. 2923.11(K)(1), defining "dangerous ordnance" as "[a]ny automatic * * * firearm," which includes "any semi-automatic firearm designed or specially adapted to fire more than *thirty-one* cartridges without reloading." (Emphasis added.) R.C. 2923.11(E). Cincinnati Municipal Code 708–37(h)(1) defines "semiautomatic firearm" as "[a]ny semiautomatic rifle or carbine that was originally designed with or has a fixed magazine or detachable magazine with capacity of more than *ten* rounds." (Emphasis added.) The conflict, therefore, exists in the differing definitions of "semiautomatic" promulgated by the General Assembly and the city of Cincinnati; and with regard to the *Canton* test, the statutory definition of a semiautomatic weapon does not constitute a general law.

{¶ 66} First, a definition is not "part of a statewide and comprehensive legislative enactment." *Canton*, 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, syllabus. Second, while intended to "apply to all parts of the state alike" as a "police, sanitary, or similar regulation[ ]," the definition of "semiautomatic" does not "prescribe a rule of conduct upon citizens generally." Id. Thus, a definition is not a general law, and no further conflict analysis is necessary.

{¶ 67} Accordingly, as Cincinnati Municipal Code 708–37 is not in conflict with any general law, I concur in reversing the judgment of the court of appeals and remanding the matter for further consideration.

---

Julia L. McNeil, City of Cincinnati Solicitor, Ernest F. McAdams, City of Cincinnati Prosecutor, and Charles A. Rubenstein, Chief Deputy Prosecutor, for appellant.

Robert H. Lyons, for appellee.